**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| SUSAN L. MORTIMER | ) | Case No.: 4:18-cv-00166 |
| | ) | |
| *Plaintiff*, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| -vs- | ) | **PLAINTIFF MORTIMER'S** |
| | ) | **OPPOSITION TO DEFENDANT'S** |
| | ) | **MOTION FOR SUMMARY** |
| WAL-MART STORES EAST, LP | ) | **JUDGMENT** |
| | ) | |
| *Defendant*. | ) | |
| _____ | ) | |

Defendant Wal-Mart fired long-time employee Susan L. Mortimer for alleged violation of its attendance policy after it failed to grant her leave under the FMLA, to which she was entitled, for days missed to treat and recover from multiple blood clots in her left leg. Wal-Mart also retaliated against Ms. Mortimer for requesting leave and complaining to Human Resources about its failure to grant her leave. Because genuine issues of material fact exist regarding Ms. Mortimer's claims, Defendant Wal-Mart's motion for summary judgment should be denied.

Respectfully submitted,

/s/ Kami D. Brauer
KAMI D. BRAUER, ESQ. (#0071030)
The Law Firm of Kami D. Brauer, LLC
700 West St. Clair Avenue, Suite 316
Cleveland, Ohio 44113
(216) 236-8537
(216) 621-7810
kamibrauer@kdbrauerlaw.com

*Counsel for Plaintiff*

## <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................................. iv

Statement of the Issues............................................................................................ vii

Summary of the Arguments Presented .................................................................. viii

**I. STATEMENT OF FACTS** ................................................................................ 1

**II. LAW AND ARGUMENT** .............................................................................. 11

**A.    Wal-Mart violated the FMLA when it terminated Ms. Mortimer after it
         wrongfully denied her request for leave.** .............................................. 12

1.   Ms. Mortimer suffered from a "serious health condition" as she
     was incapacitated for period of over 72 consecutive hours. ..................... 12

2.   Wal-Mart's argument that Ms. Mortimer was not entitled to leave for
     failure to submit a medical certification is a red-herring. ........................ 15

3.   It was ultimately Wal-Mart's legal obligation to provide
     Ms. Mortimer leave under the FMLA to which she
     was entitled; however, Wal-Mart failed to correct Sedgwick's error. ...................... 17

**B.    Wal-Mart retaliated against Ms. Mortimer for requesting
         FMLA leave and complaining about its denial.** .................................... 18

1.   Ms. Mortimer, as an "eligible employee", engaged in
     protected activity...................................................................................... 20

2.   Ms. Mortimer can establish a causal connection through
     temporal proximity, in addition to her other evidence.............................. 22

3.   Statements made by Wal-Mart management to Ms. Mortimer, within hours of
     her termination, that they were upset with her for complaining
     to HR further demonstrates a causal connection...................................... 22

**C.    Wal-Mart's alleged legitimate business reason for terminating Ms. Mortimer is pretextual as the reason: (a) was not the actual reason for her termination; and (b) was insufficient to motivate the termination. ........................................................................ 23**

**D.    The "honest belief" rule is not applicable to a claim for FMLA interference and is not dispositive of Ms. Mortimer's pretext argument ........................................................................ 24**

Certification of Exchange with Defense Counsel ........................................... 26

Certification of Page Limitation ........................................................... 27

Certificate of Service ....................................................................... 28

iii

# <u>TABLE OF AUTHORITIES</u>

*Amos v. McNairy County,* 622 Fed. Appx. 529 (6th Cir. 2015) .................................. 22, 25

*Augustus v. AHRC Nassau,* 2012 WL 6138484
(E.D. N.Y., Dec. 11, 2012) ........................................................................... 19

*Barger v. Jackson, Tennessee Hospital Company,* 92 F. Supp. 3d 754
(W.D. Tenn. 2015) ....................................................................................... 13

*Bond v. Abbott Laboratories,* 7 F. Supp. 2d 967 (N.D. Ohio 1998)................................ 14

*Bryson v. Regis Corp.,* 498 F. 3d 561 (6th Cir. 2007) ................................................ 20, 22

*Burke v. LPM Holding Company, Inc.,* 2012 WL 13055506
(D. Mass., April 17, 2012) ............................................................................. 15

*Carter v. University of Toledo.,* 349 F. 3d 269 (6th Cir. 2003) ......................................... 23

*Cavin v. Honda of Am. Mfg., Inc.,* 346 F. 3d 713 (6th Cir. 2003) .................................... 18

*Chanicka v. Jetblue Airway Corp.,* 243 F. Supp. 3d 356 (E.D. N.Y. 2017)..................... 17

*Clark v. Walgreen Co.,* 424 Fed. Appx. 467 (6th Cir. 2011)............................................ 22

*Cloar v. Kohler Company,* 2005 WL 2396643
(W.D. Tenn., Sept. 26, 2005) ........................................................................ 20

*Cooley v. Carmike Cinemas, Inc.,* 25 F. 3d 1325 (6th Cir. 1994) .................................... 22

*Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F. 3d 344 (6th Cir. 1998) ................... 23

*Green v. Wal-Mart Stores East, L.P.,* 2013 WL 3223629
(S.D. Ohio, June 25, 2013) ..................................................................... 18, 24

*Hansler v. Lehigh Valley Hospital Network,* 798 F. 3d 149 (3rd Cir. 2015)..................... 16

*Heard v. SBC Ameritech Corp.,* 2005 WL 1802086
(E.D. Mich., July 27, 2005) ........................................................................... 21

*Heard v. SBC Ameritech Corp.,* 205 Fed. Appx. 355
(6th Cir. 2006)............................................................................................... 21

*Hoffman v. Prof'l Med. Team,* 394 F. 3d 414 (6th Cir. 2005)...................................... 20-21

*Humenny v. Genex Corp.,* 390 F. 3d 901 (6th Cir. 2004)............................................ 20-21

iv

## <u>TABLE OF AUTHORITIES (conti.)</u>

*Martin v. Okaloosa County Bd. of County Commissioners,*
2015 WL 1485017 (N.D. Fla., March 31, 2015) ............................................................ 19

*Mickey v. Zeidler Tool & Die Co.,* 516 F. 3d 516 (6th Cir. 2008)............................... 22, 25

*Morris v. Family Dollar Stores of Ohio, Inc.,* 320 Fed. Appx. 330 (6th Cir. 2009).......... 21

*Nawrocki v. United Methodist Retirement Comtys., Inc.,*
174 Fed. Appx. 334 (6th Cir. 2006).......................................................................... 16, 21

*Olson v. Ohio Edison Co.,* 979 F. Supp. 1159 (N.D. Ohio 1997) ..................................... 14

*Perteet v. Saginaw Transit Authority Regional Services,*
2014 WL 4637232 (E.D. Mich., Sept. 16, 2014)............................................................ 21

*Phipps v. Accredo Health Group, Inc.,* 2016 WL 3448765
(W.D. Tenn., June 20, 2017).................................................................................. 12, 24-25

*Rodriguez v. Ford Motor Company,* 382 F. Supp. 2d 928
(E.D. Mich. 2005) ............................................................................................................ 20

*Skrjanc v. Great Lakes Power Serv. Co.,* 272 F.3d 309 (6th Cir. 2001)........................ 20-21

*Swegan v. Shepherd of the Valley Lutheran Retirement
Services, Inc.,*  2013 WL 1284309 (N.D. Ohio, March 25, 2013) .............................. 19-20

*Wysong v. Dow Chemical Co.,* 503 F.3d 441 (6th Cir. 2007) .......................................... 12

## <u>STATUTES:</u>

29 U.S.C. §2611(11)........................................................................................................ 13

29 U.S.C. §2615(a)(1)...................................................................................................... 11

29 U.S.C. §2615(a)(2)...................................................................................................... 11

29 C.F.R. §825.113 .......................................................................................................... 13

29 C.F.R. §825.115 .......................................................................................................... 13

29 C.F.R. §825.115(a)...................................................................................................... 13

29 C.F.R. §825.220.......................................................................................................... 11

## TABLE OF AUTHORITIES (conti.)

29 C.F.R. §825.220(a)(2) ............................................................................... 19

29 C.F.R. §825.220(e) ................................................................................... 21

29 C.F.R. §825.306 ....................................................................................... 16

29 C.F.R. §825.306(e) ................................................................................... 15

Preamble, 29 C.F.R. Part 825 ............................................................. 14, 15-16

## <u>STATEMENT OF THE ISSUES</u>

1.  Did Defendant Wal-Mart interfere with Plaintiff Susan L. Mortimer's rights under the FMLA when it denied her leave despite the fact she suffered from a "serious health condition", as defined by the FMLA statute and its regulations?

2.  Did Ms. Mortimer satisfy Wal-Mart's request for a medical certification when she executed an authorization providing for the release of information required for a complete and sufficient certification, as permitted under FMLA regulations?

3.  Did Ms. Mortimer, an "eligible employee" as defined by the FMLA statute, engage in protected activity when she requested FMLA leave and complained about the denial of her FMLA leave?

4.  Did Ms. Mortimer establish a "causal connection" between her engagement in protected activity and her termination by showing that she was terminated approximately 36 hours after her complaint to Human Resources about the denial of her leave request and within 43 days of her application for FMLA leave?

5.  Is a statement made by one of Ms. Mortimer's supervisors the day before her termination that Wal-Mart management was upset that she complained to Human Resources about the denial of her FMLA leave, which was subsequently confirmed by a decision-maker the same day as her termination, a "stray remark"?

6.  Do genuine issues of material fact exist for the jury to decide as to whether the sole reason for Ms. Mortimer's termination – violation of the attendance policy – was pretextual when there is evidence that the decision to terminate her was discretionary and Wal-Mart rushed to fire her before she became ineligible for termination?

7.  Is the "honest belief" rule applicable to FMLA interference claims?

8.  Do genuine issues of material fact exist for the jury to decide as to whether Defendant held an "honest belief" regarding the sole reason for Ms. Mortimer's termination, given the contradictory and shifting evidence regarding the denial of Ms. Mortimer's FMLA leave request, the circumstances surrounding her protest of such denial, and who at Wal-Mart made the decision to terminate?

## SUMMARY OF THE ARGUMENTS

1.    Ms. Mortimer suffered from a "serious health condition" in that she was diagnosed with blood clots in her left leg which incapacitated her for a period of over 72 consecutive hours.

2.    Ms. Mortimer satisfied Wal-Mart's request for a medical certification when she executed an authorization providing for the release of information required for a complete and sufficient certification, as permitted under 29 C.F.R. §825.306(e).

3.    Ms. Mortimer, an "eligible employee", engaged in protected activity when she requested FMLA leave and complained about Wal-Mart's wrongful denial of her request.

4.    Ms. Mortimer established a "causal connection" between her engagement in protected activity and her termination through temporal proximity, in addition to her other evidence.

5.    The statement made by Ms. Mortimer's supervisor that Wal-Mart management was upset about her complaint to Human Resources was not a stray remark because the comment: (a) was made by an agent within the scope of his employment; (b) was confirmed by a decision maker; (c) was not ambiguous; and (d) was stated within hours of her termination.

6.    Wal-Mart's own policies and documents create an issue of fact as to whether the decision to terminate Ms. Mortimer was discretionary. Further, Wal-Mart did not follow its usual custom and practice of terminating employees in the middle or end of their shift, as Ms. Mortimer would have been ineligible for termination within 2 hours of the start of her shift on June 20, 2017.

7.    The Sixth Circuit has held that the "honest belief" rule is not applicable to FMLA interference claims as Wal-Mart's motives for denying leave are not at issue.

8.    The "honest belief" rule is not dispositive of Ms. Mortimer's claim of pretext in light of the contradictory and shifting evidence regarding why Ms. Mortimer was denied leave, the actions taken by Wal-Mart before and after Ms. Mortimer's complaint to Human Resources, and the identity, or identities, of the decision maker(s).

## PLAINTIFF MORTIMER'S MEMORANDUM IN SUPPORT OF HER OPPOSITION

### I.    STATEMENT OF FACTS

Ms. Mortimer was employed by Wal-Mart at its East Liverpool store ("Store 1707") for close to 14 years, from October 1, 2003 until her wrongful termination on June 20, 2017. Ms. Mortimer worked full-time as an Overnight Stocker, with her usual shift from 10:00 p.m. to 7:00 a.m. (Ex. 1, Mortimer Depo, pg. 8 [lines 9-24]). Ms. Mortimer was very successful in her position. (Ex. 8, Mortimer Dec., paras. 3 and 22; Exs. 12A-12D (Evaluations); Ex. 2, Brewer Depo, pg. 46 [lines 21-25]).

Around 7:00 a.m. on Sunday, May 7, 2017, Ms. Mortimer experienced severe symptoms of what she believed to be 1 or more blood clots in her left calf, as her left calf was severely swollen and extremely tender to the touch. She had significant trouble standing and walking. Ms. Mortimer drove herself to the emergency room at St. Elizabeth Boardman Hospital. She arrived at the emergency room around 9:00 a.m. and was seen beginning at 9:37 a.m. (Ex. 1, Mortimer Depo, pgs. 21 [at line 15] – 23 [ending line 2]; Ex. 8, Mortimer Dec., para. 4; Ex. 13, relevant ER Records, pg. SM_171).

Ms. Mortimer reported to the ER physician, Dr. Thomas Gifford, that she had begun experiencing redness and swelling in her left calf 4 days prior. She also reported that, when she awoke that morning and attempted to get out of bed, she could barely put any weight on her left leg. Dr. Gifford then examined her and ordered an ultrasound of her left calf. During the examination, Dr. Gifford asked Ms. Mortimer about her job, and Ms. Mortimer explained to Dr. Gifford her duties as an Overnight Stocker, that she worked nights, and that she was scheduled to work her usual shift that night at 10:00 p.m. Dr. Gifford diagnosed Ms. Mortimer with Superficial Thrombophlebitis, as she had approximately 8 blood clots in her left calf. Dr. Gifford

then advised Ms. Mortimer that he did not want her to work for 3 days and ordered her to stay off her feet, apply warm compresses to her left calf, elevate her leg, and try not to drive. Ms. Mortimer was also instructed to follow up with her primary care physician. (Ex. 1, Mortimer Depo, pgs. 21 [at line 17] – 25 [ending line 22]; Ex. 8, Mortimer Dec., para. 5; Ex. 13, ER Records, pgs. SM_172-176; Ex. 14, ED Patient Work/School Excuse Letter).

After she was discharged from the hospital, Ms. Mortimer drove herself home. She then immediately contacted her son and daughter-in-law to drive her to Wal-Mart as her leg "was even more swollen, and more irritated, and I just could not drive any further." Unable to walk owing to the condition of her leg, Ms. Mortimer had to use an available wheelchair, and her son pushed her through the store so that she could talk to the manager on duty, which was Co-Manager Dan Reed. Mr. Reed was on a scissor lift elevated about 8 feet off the ground when Ms. Mortimer, her son, and daughter-in-law approached. Sitting in her wheelchair, Ms. Mortimer asked Mr. Reed to speak with her, but he said he was "doing something". Ms. Mortimer offered to wait, but Mr. Reed replied she would have to wait for a while. Thus, Ms. Mortimer was forced to  yell 8 feet up to Mr. Reed, who – contrary to his testimony – never lowered the scissor lift, that she had been diagnosed with blood clots and thus pulled off of work by the emergency room doctor. Mr. Reed told her she would need to apply for FMLA and to go back to the office to obtain Sedgwick's contact information, which she did. (Ex. 1, Mortimer Depo, pgs. 26 [at line 14] – 30 [ending line 20]; Ex. 8, Mortimer Dec., para. 6; Ex. 11, R. Mortimer Dec., paras. 3-5; Ex. 3, Reed Depo, pg. 19 [lines 7 – 25]).

Ms. Mortimer's son and daughter-in-law then drove Ms. Mortimer back home where she stayed the rest of the day. The only activities she engaged in were fixing herself a TV dinner and

making warm compresses to place on her leg as directed by Dr. Gifford. (Ex. 1, Mortimer Depo, pgs. 31 [at line 17] – 33 [ending line 7]).

The next day, Monday, May 8th, Ms. Mortimer contacted Sedgwick Claims Management Services, Inc., Wal-Mart's third-party administrator handling employees' FMLA claims, and applied for FMLA leave. The Sedgwick representative advised Ms. Mortimer that she would receive a packet of information regarding her request and that she would only need to complete the "Release of Information" form (Ex. 51[1], pg. SM_121; Ex. 4, Steuck Depo, pg. 9 [lines 20-24]) and provide her emergency room records she received from the hospital. The representative further advised her that, if any additional information was required, Sedgwick would reach out to her. Ms. Mortimer received her packet from Sedgwick on Friday, May 12th. (Ex. 1, Mortimer Depo, pgs. 36 [at line 23] – 37 [ending line 12]; Ex. 8, Mortimer Dec., para. 7).

On May 8th and 9th, Ms. Mortimer engaged in only limited activities and did not leave the house. Ms. Mortimer was unable to walk her dog, get her mail, and clean. She also ate only TV dinners as she was unable to stand long enough to cook or clean dishes. Ms. Mortimer also called her primary care physician, Dr. Andrew Beistel, on May 8th to make an appointment with him about her leg. As of May 9th, Ms. Mortimer's leg was not getting any better. (Ex. 1, Mortimer Depo, pgs. 33 [at line 19] – 36 [ending line 11], 40 [at line 14] – 44 [endling line 22]; Ex. 8, Mortimer Dec., paras. 9-10).

Per her Return-to-Work slip, Ms. Mortimer was to return to work on May 10th. Her shift was to begin at 10:00 p.m. as usual. Earlier that day, however, Ms. Mortimer was highly skeptical that she would be able to return to work that evening. Ms. Mortimer was still having problems walking and placing weight on her leg. She continued to treat her blood clots by

---

[1] The exhibit numbers used, from Exhibit 15 through Exhibit 51, refer to the exhibit numbering system utilized during Plaintiff's depositions of Defendant's witnesses. Only select pages of Exhibit 51 have been attached.

staying off of her feet, elevating her leg, and applying warm compresses. At 2:00 p.m., she laid down to rest, elevated her leg, and applied a warm compress to her leg for the next 5 hours. She reported to work that night and provided her Return-to-Work slip to Mr. Reed. As she was working, her leg became swollen again, and she was badly limping by the end of her shift. (Ex. 1, Mortimer Depo, pgs. 45 [at line 2] – 47 [ending line 7]); Ex. 8, Mortimer Dec., para. 11).

On Friday, May 12, 2017, Ms. Mortimer had an in-person, follow-up appointment regarding her blood clots with Dr. Beistel and was placed on a 2-week regime of antibiotics and low-dose aspirin. (Ex. 1, Mortimer Depo, pgs. 50 [at line 3] – 51 [ending line 14]; Ex. 52, Beistel Records; Ex. 9, Brauer Dec., para. 3). On that same day, Ms. Mortimer's Return-to-Work slip was provided to Sedgwick. (See Ex. 24). Reba Bishop, the Personnel Coordinator for Store 1707, averred in her Declaration that Ms. Mortimer had asked her to fax it to Sedgwick on May 12th, but Ms. Mortimer had not. In fact, in deposition, Ms. Bishop testified that the document appeared to have been received (not sent) by Wal-Mart. (Ex. 5, Bishop Depo, pgs. 31 [at line 5] – 32 [ending line 3]; Ex. 8, Mortimer Dec., paras. 12-13).

In any case, this apparently prompted Sedgwick to issue to Ms. Mortimer a letter, dated May 16, 2017, providing: "The work excuse that was received is not sufficient to approve your leave. Please have the provider complete and return the medical certification that was sent to you." (Ex. 51, pgs. SM_138). However, Ms. Mortimer never received this letter or any other communication from Sedgwick. (Ex. 1, Mortimer Depo, pgs.100 [at line 6] – 101 [line 17]; Ex 8, Mortimer Dec., para. 14). Ms. Bishop, however, received a notice via email on May 16th from Sedgwick that additional information was being requested from Ms. Mortimer. (Ex. 25, 5/16/2017 Email). As a member of Human Resources, one of Ms. Bishop's self-described duties is to help ensure associates get their required paperwork to Sedgwick. However, Ms. Bishop

4

never advised Ms. Mortimer that she received the 5/16 notice and just placed it in her file. The Store Manager, Matthew Simcox, and the Training Coordinator, Jennifer Fetty, also received the notice, but neither advised Ms. Mortimer of the notice. (Ex. 5, Bishop Depo, pgs. 26 [lines 4-6], 32 [at line 14] – 34 [ending line 9], 37 [lines 6-15]; Ex. 8, Mortimer Dec., para. 14).

On Monday, May 15th, Ms. Mortimer provided to Ms. Bishop her executed Release of Information form, Return-to-Work slip, and her emergency room medical records, as instructed by Sedgwick, and asked that these documents be faxed to Sedgwick. Ms. Bishop faxed the documents to Sedgwick on Thursday, May 18th. (Ex. 1, Mortimer Depo, pgs. 56 [at line 18] – 59 [ending line 19]; Ex. 27, 5/18/2017 Fax; Ex. 5, Bishop Depo, pgs. 38 [at line 15] – 40 [ending line 8]). After not receiving any response regarding her application for FMLA leave, Ms. Mortimer contacted Sedgwick on May 23rd, only to learn that her request had been denied. Sedgwick determined that Ms. Mortimer did not suffer from a "serious health condition" because, according to Sedgwick's Rule 30(b)(6) witness, her leave of absence was less than 4 days. There was no other reason for the denial of Ms. Mortimer's request. (Ex. 4, Steuck Depo, pgs. 12 [at line 15] – 17 [ending line 2]; Ex. 51, pg. SM_109 (highlighted)). Ms. Mortimer was then advised that her missed days would need to be "handled in store". On that same day, Ms. Mortimer contacted Co-Manager Reed and told him that her leave request had been denied and that the days would have to be handled in store. She did not tell Mr. Reed or anyone else at Wal-Mart that Sedgwick said to approve the days as "authorized absences", which meant, under Wal-Mart's attendance policy, that she would not accrue any attendance points. (Ex. 1, Mortimer Depo, pgs. 60 [at line 7] – 61 [ending line 24]; Ex. 8, Mortimer Dec., para. 15).

Ms. Mortimer received a denial letter from Sedgwick, dated May 24, 2017, which provided that her leave request was denied for the following reason: "The information provided

to us did not did not {*sic*}show you met all the requirements for a serious health condition. Doctor certified from 05/07/2017-05/09/2017 with a return to work of 05/10/2017. This leave must be handled directly through your facility." (See Ex. 30, 5/24/2017 Denial Letter). Ms. Bishop, Mr. Simcox, and Ms. Fetty also received notification via email on May 24th regarding the denial. (Ex. 5, Bishop Depo, pgs. 47 [lines 7-13]).

On May 25, 2017, Ms. Bishop contacted Sedgwick about Ms. Mortimer's leave request. According to Sedgwick's case diary, Sedgwick merely confirmed to Ms. Bishop that Ms. Mortimer's leave was denied. (Ex. 51, pg. SM_106).

On May 26, 2017, Ms. Mortimer again followed up in person with her primary care physician regarding her blood clots. (Ex. 52, pg. SM_28).

Co-Manager Reed and Mr. Brewer repeatedly assured Ms. Mortimer that her missed days would be considered "authorized" absences, as her missed days were disappearing and then reappearing on her attendance log throughout the end of May and into June. (Ex. 1, Mortimer Depo, pgs. 62 [at line 14] – 68 [lines 21]; Ex. 10, Coleman Dec., paras. 3-4).

On June 8, 2018, Ms. Bishop emailed Mr. Reed and Co-Manager Jim Smokonich about why Ms. Mortimer's May absences were marked as approved and wrongly advised them that Ms. Mortimer's leave was denied "because she did not turn in her paperwork." Ms. Bishop claimed that she obtained the reason for Ms. Mortimer's denial from Sedgwick's 5/24 email advising Wal-Mart of the denial. When cross-examined, however, Ms. Bishop admitted that failure to turn in paperwork was not the reason for the denial and that she "was evidently mistaken on that part." (Ex. 32, 6/8/2017 Email; Ex. 5, Bishop Depo, pgs. 52 [at line 1] – 55 [ending line 5]).

On June 14, 2017, Ms. Bishop, Christina Newlon (another Co-Manager), and Mr. Brewer discussed Ms. Mortimer's 3 absences in May. In accord with his understanding of the conversation, Mr. Brewer approved Ms. Mortimer's absences as "authorized" and was to advise Ms. Mortimer that, "next time she has to fill out the paperwork." (Ex. 18, 6/15/2017 Email). This is further evidenced by an email dated June 17th from Mr. Brewer (copying Ms. Newlon and Ms. Bishop[2]) advising Mr. Smokonich that he was to have a conversation with Ms. Mortimer explaining why her absences were "unapproved", but that, "[t]he resolution to this for Sue is to get her paperwork in to Sedgewick *[sic]* within the next 15 days." Although Mr. Smokonich did speak with Ms. Mortimer on June 18th about her attendance, he made no mention of turning in any further paperwork to Sedgwick, and neither did anyone else at Wal-Mart. (Ex. 17, 6/17/2017 Email; Ex. 2, Brewer Depo, pgs. 34 [at line 20] – 39 [ending line 15]; Ex. 3, Reed Depo, pg. 42 [lines 11-23]; Ex. 8, Mortimer Dec., para. 17).

On June 19, 2017, Ms. Mortimer called Wal-Mart's Department of Human Resources. Barbara Miller, an administrative assistant, answered the phone and took a message from Ms. Mortimer. Ms. Mortimer asked for an "Open Door", complaining that she had been wrongfully denied FMLA leave and had been told multiple times by management that her missed days were "authorized", yet she accrued 3 attendance points. Ms. Miller told Ms. Mortimer that the store would be contacted and that HR would get back with her regarding her request for an "Open Door" meeting. (Ex. 1, Mortimer Depo, pgs. 69 [at line 3] – 70 [ending line 2], 78 [at line 2] – 79 [ending line 9]; Ex. 39, 6/19/2017 Email, Walmart-Mortimer pg. 2019; Ex. 6, Miller Depo, pgs. 24 [at line 10] – 26 [ending line 2]).

---

[2]     See Ex. 53 (Letter dated 10/18/2018) advising that Ms. Bishop also received the 6/17/2017 email; Ex. 9, Brauer Dec., para. 4.

Per Wal-Mart's FMLA policy, an employee who disputes an FMLA leave decision can request an "open door" meeting with Wal-Mart. (Ex. 41, FMLA Leave of Absence Policy, pg. Walmart-Mortimer 1397; Ex. 7, Mavar Depo, pgs. 24 [at line 24] – 25 [ending line 8]). In Wal-Mart's "FMLA Leave of Absence Management Guidelines – Ohio", upon receiving a request for an "Open Door", the HR representative "must conduct a thorough investigation into the associate's concern." Significantly, the policy also states: "If the Open Door results in any changes to the original decision, the HR Representative must communicate the changes to Sedgwick." (Ex. 42, FMLA Management Guidelines; Ex. 7, Mavar Depo, pg. 27 [lines 1-9]).

Ms. Miller then emailed Ms. Mortimer's store manager Mr. Simcox and the Human Resources Manager, Kelly Mavar, about her complaint. Ms. Mavar never responded, and Mr. Simcox forwarded Ms. Miller's email relaying Ms. Mortimer's complaint to Mr. Reed and Mr. Smokonich asking both to look into the matter. (Ex. 39, Walmart-Mortimer 2019).

Later that same day, June 19th, Mr. Reed emailed Ms. Miller at 4:24 p.m., near the end of her shift, relaying completely false information provided to him second-hand by Ms. Bishop (see Section II.A.3, below). That evening, when Ms. Mortimer appeared for work, Co-Manager Smokonich approached Ms. Mortimer and told Ms. Mortimer that management was upset that she had complained to HR. This conversation was witnessed by Michelle Coleman, another Overnight Stocker. (Ex. 1, Mortimer Depo, pgs. 70 [at line 3] – 71 [ending line 20]; Ex. 10, Coleman Dec., para. 5).

The morning of June 20th, at the end of her shift at 7:00 a.m. as she was leaving, Mr. Reed also confirmed to Ms. Mortimer that management was upset with her. (Ex. 1, Mortimer Depo, pgs. 118 [at line 4] – 121 [ending line 20])[3].

---

[3]     See also Ms. Mortimer's Errata Sheet in Exhibit 1, correcting Dan Reed's name.

Later that morning, near the beginning of her shift, Administrative Assistant Miller –
without any independent investigation whatsoever, without reviewing any documents, without
having any conversations with Ms. Mavar or any member of management, without having any
further conversations with Ms. Mortimer, and without having anyone review her email prior to it
being sent – emailed Mr. Reed and provided the following inappropriate direction to him, given
her low level position[4]:

> Thank you for looking into this and providing detailed information and clarity. She failed
> to include the fact when she called me that she clearly had attendance concerns aside
> from the points she gained when she missed the 3 days! :}
>
> You're within guidelines of both attendance policy and Leave policy. Her Loa would not
> have been approved for multiple reasons, associate only qualifies if they miss *more* than
> 3 days, follow up treatment required within 30 days and paperwork completed and
> submitted in the timeframe required. By not meeting the mentioned requirements for Loa,
> her absences default to a leave request being denied in the attendance policy.
>
> ***I would suggest meeting with her and following the next course of action according to
> policy.*** [Emphasis added]. (See Ex. 39, Walmart-Mortimer 2017).

(See also Ex. 6, Miller Depo, pgs. 14 [lines 14-23], 28 [at line 2] – 34 [ending line 16]); Ex. 7,
Mavar Depo, pgs. 42 [at line 2] – 43 [ending line 24]).

Later that evening, on June 20th, Co-Manager Tina Wetzel and Mr. Brewer terminated
Ms. Mortimer 5 minutes after she clocked in for her shift at 10:00 p.m. for violating Wal-Mart's
attendance policy because she had accrued 9 attendance occurrences. Terminating an associate at
the beginning of her/his shift is an uncommon practice, as Wal-Mart usually will terminate an
employee either in the middle or after an employee's scheduled shift. (Ex. 1, Mortimer Depo, pg.
72 [lines 3-21]; Ex. 3, Reed Depo, pg. 15 [lines 12-17]; Ex. 8, Mortimer Dec., para. 21; Ex. 10,
Coleman Dec., para. 6). Had Ms. Mortimer been permitted to work even 2 hours into her shift,

---

[4]     As an administrative assistant, Ms. Miller's duties include answering the phone, relaying messages, filing,
and running reports. Indeed, the last training that Ms. Miller had regarding the FMLA was 16 years prior in March
2001. (Ex. 6, Miller Depo, pgs. 13 [lines 4-15], 18 [lines 2-10], 47 [at line 13] – 48 [ending line 2]; Ex. 58, Miller
Training Log (highlighted); Ex. 9, Brauer Dec., para. 6).

one of Ms. Mortimer's prior absences would have become "inactive" at the stroke of midnight, taking the number of her attendance occurrences down to 8 and, thus, she would not have been subject to termination per Wal-Mart's attendance policy. Further, another absence would have also become inactive on June 26th. (Ex. 19, June 2017 Attendance Report; Ex. 46, Attendance/Punctuality Policy; Ex. 2, Brewer Depo, pgs. 53 [at line 1] – 54 [ending line 24]); Ex. 7, Mavar Depo, pg. 31 [lines 3-25]).

During her termination meeting, Ms. Mortimer showed Ms. Wetzel her denial letter from Sedgwick in an attempt to explain her circumstances, but Ms. Wetzel took the letter from her, said, "I don't have to deal with this," and tossed the letter aside. (Ex. 1, Mortimer Depo, pgs. 72 [at line 16] – 73 [ending line 2]).

Wal-Mart has submitted contradictory evidence as to who made the decision to terminate Ms. Mortimer. In its answers to Interrogatories, Wal-Mart stated that Mr. Reed and Mr. Brewer made the decision to terminate. (Ex. 40, Answer to Int. No. 4). In deposition, however, Mr. Reed (who had verified Wal-Mart's Answers to Interrogatories) and Mr. Brewer both denied that they made the decision to terminate Ms. Mortimer. (Ex. 2, Brewer Depo, pg. 46 [lines 11-14]; Ex. 3, Reed Depo, pgs. 45 [lines 19-24], 57 [lines 3-11]). Instead, Mr. Reed claimed that Ms. Mavar made the decision to terminate. Wal-Mart, however, never identified Ms. Mavar in its Answers to Interrogatories or its Initial Disclosures. (Ex. 40; Ex. 54, Defendant Initial Disclosures). Now, Wal-Mart has submitted the Declaration of Mr. Reed that he and Ms. Mavar made the decision to terminate. (See Defendant's Ex. 12, para. 13). Wal-Mart has also submitted the Declaration of Ms. Mavar in support of its summary judgment motion in which she avers that she made the decision to terminate. (See Defendant's Ex. 2, paras. 9-10). However, in deposition, Ms. Mavar

testified that she did not make the decision to terminate Ms. Mortimer and did not know who did. (Ex. 7, Mavar Depo, pgs. 47 [at line 17] – 48 [ending line 21]).

The next day, on June 21, 2017, Ms. Mortimer again called HR and told Ms. Miller that she had been fired in retaliation for complaining and requested to have an "Open Door" meeting with the head of HR. Although Ms. Mavar was in fact notified, neither her nor anyone else from HR contacted Ms. Mortimer about her second request for an "Open Door" meeting. (Ex. 1, Mortimer Depo, pgs. 74 [at line 14] – 75 [ending at 17]; Ex. 43, 6/21/2017 Email; Ex. 7, Mavar Depo, pgs. 44 [at line 4] – 47 [ending line 12]).

After her termination, Ms. Mortimer filed for unemployment benefits. Sometime between her termination and Wal-Mart's response to her application, someone, either a member of Wal-Mart management or Ms. Bishop who had access to associates' attendance records and can make changes, changed Ms. Mortimer's attendance records to show that 3 previously approved absences in June 2017 for bereavement leave were now "unapproved" absences. (Compare Exs. 19 and 34, dates 6/11, 6/12, and 6/15; Ex. 55, June Paystub (highlighted); Ex. 8, Mortimer Dec., paras. 19 and 24; Ex. 2, Brewer Depo, pg. 54 [lines 12-17]; Ex. 5, Bishop Depo, pgs. 53 [lines 9-20], 71 [at line 1] – 75 [ending line 4]). Wal-Mart submitted the changed document to the Unemployment Compensation Review Commission showing that Ms. Mortimer had incurred 10 absences. (Ex. 56, Walmart-Mortimer 1523-1524; Ex. 9, Brauer Dec., para. 5). Despite Wal-Mart's appeals, Ms. Mortimer was awarded unemployment benefits.

## II.    LAW AND ARGUMENT

Ms. Mortimer has alleged 3 FMLA claims: (Count I) Interference (29 U.S.C. §2615(a)(1)) for Wal-Mart's failure to grant her leave; (Count II) Retaliation (29 U.S.C. §2615(a)(2)) by Wal-Mart against her for requesting leave; and (Count III) Retaliation/Opposing

11

Unlawful Conduct (29 U.S.C. §2615(a)(2) and 29 C.F.R. §825.220) for Ms. Mortimer's complaint to Wal-Mart HR about its failure to grant her leave, all resulting in her termination.

## A.  Wal-Mart violated the FMLA when it terminated Ms. Mortimer after it wrongfully denied her request for leave.

For a claim of interference under the FMLA, Ms. Mortimer must show that: (1) she was an eligible employee under the Act; (2) she suffered from a serious health condition; (3) Wal-Mart was a covered employer; (4) she gave Wal-Mart notice of her intention to take leave; and (5) Wal-Mart denied her benefits to which she was entitled or used the leave against her in an unlawful manner. *Wysong v. Dow Chemical Co.,* 503 F.3d 441, 447 (6th Cir. 2007). Whether Ms. Mortimer was denied benefits to which she was entitled is an objective inquiry "divorced from the employer's motives". *Phipps v. Accredo Health Group, Inc.*, 2016 WL 3448765, *11 (W.D. Tenn., June 20, 2016).

Wal-Mart does not dispute that Ms. Mortimer meets elements (1), (3), and (4). Instead, Wal-Mart argues that it properly denied Ms. Mortimer's leave request because she did not suffer from a serious health condition and did not provide a medical certification.

## 1.  Ms. Mortimer suffered from a "serious health condition" as she was incapacitated for a period of over 72 consecutive hours.

Ms. Mortimer suffered from a "serious health condition" in that: (a) she was diagnosed with blood clots in her left leg which incapacitated her for a period of over 72 consecutive hours; (b) she was incapacitated in that she could not work or perform regular daily activities due to her blood clots, the treatment ordered by her treating physician, and the necessary period of recovery; (c) she was subsequently treated by a health care provider for her blood clots 2 times within 30 days of the first day of her incapacity; (d) she was also treated by a health care provider on at least 1 occasion which resulted in a regimen of continuing treatment under the

12

supervision of her doctor (*i.e.*, a 2-week regimen of antibiotics); and (e) each follow-up appointment with her doctor regarding her blood clots was in person and the first in-person treatment visit took place within 7 days of her first day of incapacity. See 29 U.S.C. §2611(11); 29 C.F.R. §825.113; and 29 C.F.R. §825.115.

Of the requirements listed above, Wal-Mart argues that Ms. Mortimer failed to meet only one, *i.e.*, that she was not incapacitated for a period of over 72 hours. Wal-Mart argues that Ms. Mortimer had to be incapacitated for 4 consecutive, full calendar days and that her leave request was for "less than 4 days". (Ex. 31, pg. Walmart-Mortimer 1059). This is not the law.

The court in *Barger v. Jackson, Tennessee Hospital Company*, 92 F. Supp. 3d 754 (W.D. Tenn. 2015), specifically rejected this argument based on the plain language of the 29 C.F.R. §825.115(a), which defines the requisite period of incapacity as "more than three consecutive, full calendar days", and that any period of time over 72 hours satisfies this element:

> Although no Sixth Circuit decision appears to be on point, the Eleventh Circuit has directly contradicted [defendant's] position in dicta. See *Russell v. N. Broward Hosp.*, 346 F. 3d 1335, 1343-44 (11th Cir. 2003) ("[I]t takes *some fraction more* than three whole calendar days in a row to constitute the 'period of incapacity' required under §825.11[5(a)] …. Partial days do not count, *except at the beginning or end of the 'period of incapacity'* in order to make up the 'more than' element." (emphasis added). *Id.* at 764.

The *Barger* court further considered the 2009 amendments to the regulations. Prior to 2009, the period of incapacity was defined as "three consecutive calendar days". As a result, individuals would be eligible for FMLA leave if they were incapacitated for only partial days *during* the 3 calendar days. The addition of the word "full" was merely to correct this issue, but not require that an individual be actually incapacitated for 4 consecutive days:

> By its own terms, then, the regulation defines a single interval of time, and the term "full" is given effect by defining the initial three-day period rather than creating a requirement for an additional fourth full day. Had the provision's drafters intended to adopt [defendant's] proposed meaning, they could have done so by designating the period of incapacity as "at least four consecutive, full calendar days." To satisfy this portion of §

13

825.115(a), then, ***a plaintiff need only be incapacitated for some fraction more than three consecutive, full calendar days***. [Emphasis added]. *Id.* at 764.

See also Ex. 57, Preamble, 29 C.F.R. Part 825, The Family and Medical Leave Act of 1993; Final Rule, pgs. 67946-67947 (highlighted). The cases relied upon Wal-Mart for its position (*Olson* and *Bond*)[5] were decided prior to the 2009 amendments.

Conservatively, Ms. Mortimer's incapacitation began as of 9:37 a.m., when hospital medical personnel began their examination of her. She was at the hospital until at least 12:55 p.m., when her discharge papers were printed. Aware that she worked nights with her usual shift beginning at 10:00 p.m., the ER doctor ordered that she be off work 3 days – May 7, 8, and 9 – and not return to work until her night shift on May 10th, starting at 10:00 p.m. Ms. Mortimer was still treating her blood clots until 7:00 p.m. on May 10th, when she began to get ready for work. Thus, Ms. Mortimer was unable to work, and thus incapacitated, for over 72 hours as follows:

| | |
|---|---|
| 5/7 from 9:37 a.m. until 12:55 p.m. = | 3 hours, 18 minutes |
| 5/7 at 12:55 p.m. to 5/8 at 12:55 p.m. = | 24 hours |
| 5/8 at 12:55 p.m. to 5/9 at 12:55 p.m. = | 24 hours |
| 5/9 at 12:55 p.m. to 5/10 at 12:55 p.m. = | 24 hours |
| 5/10 at 12:55 p.m. to 7:00 p.m. = | 6 hours, 5 minutes |
| ***Total hours:*** | ***81 hours, 23 minutes*** |

Ms. Mortimer submitted to Sedgwick her Return-to-Work slip and emergency room records showing this information. Indeed, Sedgwick knew upon intake that Ms. Mortimer worked nights as an Overnight Stocker. (Ex. 31, pg. 1065: "Job Title: O/N 931 Stock/994 Fresh CL"). Even with this information, no red flags were raised by Sedgwick as Sedgwick was operating under the legally faulty assumption that Ms. Mortimer did not suffer from a serious

---

[5]      *Olson v. Ohio Edison Co*., 979 F. Supp. 1159 (N.D. Ohio 1997); *Bond v. Abbott Laboratories*, 7 F. Supp. 2d 967 (N.D. Ohio 1998).

health condition because she was not incapacitated for 4 consecutive, full calendar days. (Ex. 4, Steuck Depo, pg. 30 [lines 18-22]).

2.      ***Wal-Mart's argument that Ms. Mortimer was not entitled to leave for failure to submit a medical certification is a red-herring.***

Wal-Mart argues that Ms. Mortimer's request for FMLA leave was properly denied because she did not submit a medical certification. This argument is legally and factually incorrect and seeks to mislead and shift the blame to Ms. Mortimer.

First, Wal-Mart ignores Sedgwick's documents and the testimony of Sedgwick's Rule 30(b)(6) representative, all of which confirm that Sedgwick denied Ms. Mortimer's leave request based on the faulty premise that leaves of less than 4 days did not qualify under the FMLA. This was the cited reason by Sedgwick for the denial, not for any other reason alleged by Wal-Mart.

Second, Ms. Mortimer never received a request from Sedgwick to have a physician complete a medical certification form. Indeed, Sedgwick's Release of Information form states, "Sedgwick ***may*** require a healthcare provider certification ('FMLA Certification Form') to support your need for family and medical leave . . . ." (Ex. 27, Walmart-Mortimer 1102). This supports Ms. Mortimer's testimony that Sedgwick requested only an executed Release of Information form. (Ex. 1, Mortimer Depo, pgs. 96 [at line 22] – 97 [ending line 14]).

Third, Ms. Mortimer satisfied the certification requirement by providing the Release of Information form allowing Sedgwick to contact her health care provider directly. Under 29 C.F.R. §825.306(e), "an employee may choose to comply with the certification requirement by providing the employer with an authorization, release, or waiver allowing the employer to communicate directly with the health care provider of the employee . . . ." See *Burke v. LPM Holding Company, Inc*., 2012 WL 13055506, at *3 (D. Mass. April 17, 2012) (citing 29 C.F.R. §825.306(e)). The Preamble to the Regulations, discussing §825.306(e), further provides: "[A]n

15

employee remains free to choose to comply with the certification requirement in this manner by executing an authorization ***providing for the release of information required for a complete and sufficient certification***." [Emphasis added]. (See Ex. 57, Preamble, 29 C.F.R. Part 825, The Family and Medical Leave Act of 1993; Final Rule, pgs. 68015 (highlighted)). Had there been some deficiency with regard to the certification requirement, Sedgwick would have sent out a notice of deficiency. (Ex. 4, Steuck Depo, pg. 21 [lines 2-10]).

Thus, because Ms. Mortimer choose to satisfy the certification requirement in this manner, Wal-Mart's argument that the information she provided to Sedgwick was ambiguous or insufficient is inapplicable. In any case, the information provided by Ms. Mortimer was the opposite and, contrary to Wal-Mart, did satisfy the requirements of §825.306.[6] Even if it could be argued that such information was ambiguous, such ambiguity could have been cured by Sedgwick as Ms. Mortimer gave it authorization to contact her health care providers, but Sedgwick did not do so. (Ex. 4, Steuck Depo, pg. 24 [lines 21-24]).

Further, Wal-Mart's argument that the medical information provided by Ms. Mortimer constituted a "negative certification" is also inapplicable. In *Hansler v. Lehigh Valley Hospital Network*, 798 F. 3d 149, 155 (3rd Cir. 2015), the court found that, in cases involving negative certifications, those certifications contained "affirmative statements from the employees' physicians that the employee would not miss any work, which, by definition, meant they did not have "serious health condition[s]".[7] Such is not the case here.

---

[6]     Contrary to Wal-Mart, the documentation provided by Ms. Mortimer provided or confirmed: (1) the contact information for the hospital and Dr. Gifford as the ER doctor; (2) the approximate date of when the blood clots commenced; (3) a description of the appropriate medical facts regarding her diagnosis and treatment; and (4) her inability to work.

[7]     Such was the case in *Nawrocki v. United Methodist Retirement Communities, Inc*., 174 Fed. Appx. 334 (6th Cir. 2006), cited by Wal-Mart, in which plaintiff's doctor initially and affirmatively stated it would not be necessary for plaintiff to miss work.

**3.** **_It was ultimately Wal-Mart's legal obligation to provide Ms. Mortimer leave under the FMLA to which she was entitled; however, Wal-Mart failed to correct Sedgwick's error._**

As discussed above, per its FMLA policies, Wal-Mart was not bound by Sedgwick's wrongful decision regarding Ms. Mortimer's leave request, and it could have corrected it. In *Chanicka v. Jetblue Airways Corp.*, 243 F. Supp. 3d 356, 363 (E.D. N.Y. 2017), cited by Wal-Mart, the court held that an employer may be found to have not acted in good faith, and thus liable for liquidated damages, "where, as here, an employer is alleged to have been confronted with the [third party] administrator's mistakes before deciding to terminate the employee, as such termination would ostensibly not have been in 'good faith'."

Here, per Ms. Miller's 6/19/2017 email, Wal-Mart was operating under the same faulty premise that she was not incapacitated for more than 3 days.[8] After Ms. Mortimer complained on June 19th to HR and requested an "Open Door" as permitted under its FMLA policies, Wal-Mart failed to follow its own policies and take necessary and adequate steps to properly determine Ms. Mortimer's eligibility for leave. Ms. Miller did nothing but email Mr. Simcox asking that someone follow up with Ms. Mortimer. Mr. Simcox passed the buck to Mr. Reed. Mr. Reed then only spoke with Ms. Bishop who relayed to Mr. Reed information that was, at best, "mistaken", as she characterized it in her deposition. Ms. Bishop falsely told Mr. Reed that Ms. Mortimer had failed to submit paperwork to Sedgwick, that she called Ms. Mortimer and told her to call Sedgwick to figure out what was missing, that Ms. Mortimer had told her that the ER would not complete her paperwork for her, and that Ms. Mortimer had failed to attend any follow-up doctor's appointments. (See Ex. 39, Walmart-Mortimer 2018). All of this information was untrue, and Mr. Reed failed to take any steps to verify any information regarding Ms. Mortimer's

---

[8]    Indeed, the members of Wal-Mart management had scant training regarding the FMLA and its requirements. (Ex. 2, Brewer Depo, pgs. 18 [at line 12] – 19 [ending line 7], 40 [at line 17] – 41 [ending line 1]; Ex. 3, Reed Depo, pgs. 17 [at line 14] – 19 [ending line 6], 54 [at line 18] – 57 [ending line 2]; Ex. 5, Bishop Depo, pg. 19 [lines 2-22]; Ex. 59, Bishop Training Log (highlighted); Ex. 9, Brauer Dec., para. 7).

leave request. (Ex. 8, Mortimer Dec., para. 18; Ex. 3, Reed Depo, pgs. 40 [at line 18] – 41 [ending line 5]). The only step taken by Ms. Mavar was to talk to Mr. Reed inquiring only if he removed Ms. Mortimer's attendance occurrences. (Ex. 7, Mavar Depo, pgs. 38 [at line 19] – 41 [ending line 12]). In fact, no members of management took any steps to investigate her leave request, including simply having a conversation with Ms. Mortimer.

Even accepting Wal-Mart's position that Ms. Mortimer failed to submit a medical certification, Ms. Mortimer apparently had the opportunity to cure any alleged paperwork issue within 15 days of Mr. Brewer's 6/15/2017 email; yet, no one communicated this to her. As a result, Ms. Mortimer was terminated for absenteeism. However, in cases in which an employee is terminated for absenteeism, "a termination based only in part on an absence covered by the FMLA, even in combination with other absences, may still violate the FMLA." *Green v. Wal-Mart Stores East, L.P.*, 2013 WL 3223629, *5-7 (S.D. Ohio, June 25, 2013), quoting *Cavin v. Honda of Am. Mfg., Inc*., 346 F. 3d 713 (6th Cir. 2003) (superseded on other grounds by statute). Here, there is a genuine issue of fact as to whether the 3 days missed in May should have been covered by the FMLA. Like the plaintiff in *Cavin*, Wal-Mart used the 3 May absences, which it wrongfully found as not FMLA-qualifying, as a "negative factor" in its decision to terminate Ms. Mortimer, thus violating the FMLA. *Id*.; see also *Cavin*, 346 F. 3d at 727 (defendant's wrongful conclusion that certain absences were not FMLA-qualifying was arguably a "negative factor" in defendant's decision to terminate plaintiff for absenteeism).

**B.  Wal-Mart retaliated against Ms. Mortimer for requesting FMLA leave and complaining about its denial.**

Ms. Mortimer has alleged 2 retaliation claims – one based on Ms. Mortimer's request for FMLA leave, and the other based on Ms. Mortimer's complaint that she was wrongfully denied FMLA. Under the FMLA, "an employer is prohibited from discharging or in any other way

discriminating against any person (whether or not an employee) for opposing or complaining about any unlawful practice under the Act." Further, a person is "similarly protected if they oppose any practice which they reasonably believe to be a violation of the Act or regulations". See 29 C.F.R. §825.220(a)(2) and (e); see also *Augustus v. AHRC Nassau*, 2012 WL 6138484 (E.D. N.Y., Dec. 11, 2012); and *Martin v. Okaloosa County Bd. of County Commissioners*, 2015 WL 1485017 (N.D. Fla., March 31, 2015).

Ms. Mortimer's direct evidence of retaliation includes: (1) the contradictory and shifting testimony regarding who made the decision to terminate Ms. Mortimer[9]; (2) Ms. Mortimer was terminated approximately 36 hours after her complaint to Wal-Mart HR and within 43 days of her application for FMLA leave; (3) upon learning that Ms. Mortimer had complained on June 19th to HR about the denial of her FMLA leave request, Co-Managers Reed and Smokonich put Ms. Mortimer on notice that she was targeted because of her complaint to HR; (4) Wal-Mart unreasonably interpreted Ms. Mortimer's 5/24 denial letter that her leave was denied because she failed to turn in her paperwork; (5) Per Mr. Brewer's June 15th email, Ms. Mortimer could have cured any alleged paperwork issue within 15 days; yet, no one told her; (6) after Ms. Mortimer appealed Sedgwick's leave determination, Wal-Mart failed to follow its own policy requiring it to adequately investigate the determination (see Section II.A.3, above); (7) given her health crisis, management had the discretion, under Wal-Mart's absence policy, to approve Ms. Mortimer's absences and/or not terminate her (see Section C, below); (8) within 2 hours of her termination, one of Ms. Mortimer's absences would have become inactive, taking her to 8 attendance occurrences, and Mr. Reed knew it but moved forward with the termination anyway; and (9) Wal-Mart altered Ms. Mortimer's attendance record after her termination.

---

[9]     See *Swegan v. Shepherd of the Valley Lutheran Retirement Services, Inc.,* 2013 WL 1284309, *7 (N.D. Ohio, March 25, 2013) ("A reasonable fact-finder may infer a furtive motive from [defendant's] contradictory testimony.")

Ms. Mortimer can also indirectly prove retaliation by showing that: (1) she exercised or attempted to exercise rights under the Act; (2) the employer took an adverse employment action against her; and (3) a causal relationship exists between her exercise or attempted exercise of rights under the FMLA and the adverse employment action. At the *prima facie* stage, Ms. Mortimer's burden of proof is minimal. *Swegan, supra*, citing *Bryson v. Regis Corp*., 498 F. 3d 561, 570 (6th Cir. 2007). To succeed on a retaliation claim, plaintiff does not need to prove that retaliation was the sole reason for her termination but was only a substantial or motivating factor in the employer's decision. *Id*., citing *Daugherty v. Sajar Plastics, Inc*., 544 F. 3d 696, 707 (6th Cir. 2008).

### 1.    Ms. Mortimer, as an "eligible employee", engaged in protective activity.

Wal-Mart argues that, since Ms. Mortimer's leave request was denied, she cannot prove the 1st prong of her claim. This is not the law. Even though Ms. Mortimer's claim was denied, at the time she requested leave, Ms. Mortimer met the definition of an "eligible employee" which Wal-Mart does not dispute, *i.e.*, employed 12 months prior to her request for leave and had worked 1,250 hours in that 12-month period. (See Ex. 8, Mortimer Dec., para. 8). In *Rodriguez v. Ford Motor Company*, 382 F. Supp. 2d 928, 935 (E.D. Mich. 2005), the court held that, "[t]hus, Plaintiff may have enjoyed the protection of the FMLA before an actual designation by Defendant Ford that the absences were or were not FMLA qualifying." See also *Cloar v. Kohler Company*, 2005 WL 2396643 (W.D. Tenn., Sept. 26, 2005) (court held plaintiff had stated a claim for retaliation on the grounds that she was fired merely for requesting FMLA leave, regardless of whether her absences were, in fact, FMLA-qualifying), citing *Skrjanc v. Great Lakes Power Serv. Co*., 272 F. 3d 309 (6th Cir. 2001) and *Hoffman v. Prof'l Med. Team*, 394 F. 3d 414 (6th Cir. 2005). See also *Humenny v. Genex Corp*., 390 F. 3d 901 (6th Cir. 2004).

The 3 unpublished cases cited by Wal-Mart within this Circuit do not accurately state the law. *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 Fed. Appx. 330 (6th Cir. 2009), makes no mention of the 3 published 6th Circuit cases (*Skrjanc, Hoffman,* and *Humenny*) cited above squarely addressing the issue. The court in *Nawrocki v. United Methodist Retirement Comtys., Inc.*, 174 Fed. Appx. 334 (6th Cir. 2006), and *Heard v. SBC Ameritech Corp.*, 2005 WL 1802086 (E.D. Mich., July 27, 2005)[10], merely cite to *Skrjanc* with no discussion. As discussed in *Perteet v. Saginaw Transit Authority Regional Services*, 2014 WL 4637232, *7 (E.D. Mich., Sept. 16, 2014), the cases of *Skrjanc, Hoffman,* and *Humenny* all "concern retaliation by an employer for an employee requesting FMLA leave or stating an intent to request such leave. . . . The eligible employees were requesting forms of *leave* that were not eligible under the FMLA. . . . The employees in those cases were able to clear the initial barrier of employee-eligibility . . . ." To find otherwise would mean that eligible employees who in good faith request FMLA leave and are terminated merely for making such a request would be without protection.

In any case, even if Wal-Mart correctly stated the law, which it has not, a question of fact exists as to whether Ms. Mortimer was entitled to leave under the FMLA as discussed above. Also, such argument cannot be applicable to Ms. Mortimer's second retaliation claim based on her good faith complaint that Wal-Mart's denial of her FMLA request was wrong. Under 29 C.F.R. §825.220(e), "[i]ndividuals, and not merely employees, are protected from retaliation for opposing (e.g., filing a complaint about) any practice which is unlawful under the Act. They are similarly protected if they oppose any practice which they reasonably believe to be a violation of the Act or regulations." Again, in any case, Ms. Mortimer was an eligible employee and whether she was entitled to leave remains a question for the jury.

---

[10]      The 6th Circuit in *Heard v. SBC Ameritech Corp.*, 205 Fed. Appx. 355 (6th Cir. 2006), merely affirmed the District Court's ruling regarding Plaintiff's motion to amend her complaint.

There is no dispute that Wal-Mart took an adverse employment action against Ms. Mortimer by terminating her. Wal-Mart does dispute, however, that a causal connection exists between her termination and the protected activity engaged in by her.

**2.      *Ms. Mortimer can establish a causal connection through temporal proximity, in addition to her other evidence.***

Ms. Mortimer can show a causal connection between her termination and the exercise of her rights through temporal proximity, in addition to the other evidence discussed above, as she was terminated approximately 36 hours after her complaint to Wal-Mart HR and within 43 days of her application for FMLA leave. See *Amos v. McNairy County,* 622 Fed. Appx. 529, 537-537 (6th Cir. 2015) ("This court has explicitly held that temporal proximity alone can establish causation."); *Clark v. Walgreen Co.,* 424 Fed. Appx. 467, 473 (6th Cir. 2011) (per curiam) (2 months between leave and firing showed causal connection); *Mickey v. Zeidler Tool & Die Co.,* 516 F. 3d 516, 523-525 (6th Cir. 2008); *Bryson v. Regis Corp.,* 498 F. 3d 561, 571 (6th Cir. 2007).

**3.      *Statements made by Wal-Mart management to Ms. Mortimer, within hours of her termination, that they were upset with her for complaining to HR further demonstrates a causal connection.***

Wal-Mart argues that Mr. Smokonich's statement, that management was upset because Ms. Mortimer complained to HR, was merely a "stray remark" because he was not involved in the decision to terminate. Initially, as detailed above, Wal-Mart is confused about who was or was not involved in the decision to terminate, and it offers no affidavit from Mr. Smokonich saying one way or another. In *Cooley v. Carmike Cinemas, Inc*., 25 F. 3d 1325 (6th Cir. 1994), cited by Wal-Mart, the Court used the following test to determine the admissibility of like statements: (1) whether the comments were made by a decision maker or by an agent within the scope of his employment; (2) whether they were related to the decision-making process; (3) whether they were more than merely vague, ambiguous, or isolated remarks; and (4) whether

they were proximate in time to the act of termination. Using this test, Mr. Smokonich's statement to Ms. Mortimer clearly can be used to show a causal connection. Mr. Smokonich, one of Ms. Mortimer's supervisors, was kept abreast of her leave request and the issues with her absences throughout. (Ex. 1, Mortimer Depo, pgs. 12 [at line 17] – 13 [ending line 9]). Per Mr. Brewer's email, Mr. Smokonich was to advise Ms. Mortimer of the additional time she apparently had to have her leave approved but chose not to do so. Moreover, Wal-Mart completely ignores the statement by Mr. Reed – a decision maker – confirming Mr. Smokonich's statement. Thus, Mr. Smokonich's statement was anything but vague and ambiguous and was made within hours of Ms. Mortimer's complaint and termination. See also *Ercegovich v. Goodyear Tire & Rubber Co.,* 154 F. 3d 344, 356 (6th Cir. 1998); and *Carter v. University of Toledo*, 349 F. 3d 269 (6th Cir. 2003) (statements regarding discriminatory atmosphere were non-hearsay even if the person who made the statements was not the decision-maker of plaintiff's termination).

**C.      Wal-Mart's alleged legitimate business reason for terminating Ms. Mortimer is pretextual as the reason: (a) was not the actual reason for her termination; and (b) was insufficient to motivate the termination.**

Wal-Mart's sole reason for terminating Ms. Mortimer is that she violated the attendance policy. As detailed above, Ms. Mortimer disputes that her alleged violation of the attendance policy was the actual reason for her termination or was sufficient to motivate her termination. Wal-Mart's argument that other employees were granted FMLA leave is inapposite and does not show that Wal-Mart did not use the non-FMLA qualifying days against Ms. Mortimer as a negative factor or that Wal-Mart did not retaliate against Ms. Mortimer for requesting leave or for complaining about the wrongful denial of her leave request.[11] In addition to the evidence

---

[11]      Wal-Mart further argues that Ms. Mortimer had previously used FMLA in 2009 and suffered no adverse result. Ms. Mortimer, however, was under different management at the time. (Ex. 8, Mortimer Dec., para. 20).

outlined in Section II.B., above, that can also be used to show pretext[12], Wal-Mart's absence policy provides, if an associate incurs 9 absences during a rolling 6-month period, she "will be subject to termination", *not* "will be terminated". (Ex. 46, Attendance/Punctuality Policy – Ohio, Walmart-Mortimer pg. 1527). In Wal-Mart's attendance tracking system, it provides the following contradictory warning to employees: "Exceeding the maximum number of occurrences allowed by the Attendance Policy in a rolling six month period ***may*** result in termination." Indeed, this was Ms. Mortimer's understanding as well. (Ex. 60, Global Time & Attendance printout; Ex. 8, Mortimer Dec., para. 25; Ex. 1, Mortimer Depo, pg. 19 [lines 9-19]). Further, the attendance policy lists the types of absences that may be "authorized", one of which includes a catch-all, "Extraordinary circumstances approved by MHRM" (*i.e.,* Market Human Resource Manager). (Ex. 46, Walmart-Mortimer 1526-1527). Ms. Mavar, as the Market HR Manager, could have also deemed her absences as "authorized". (Ex. 7, Mavar Depo, pg. 32 [lines 4-18]).

Additionally, within 2 hours after her termination, one of Ms. Mortimer's absences became inactive, and Mr. Reed knew. At 3:46 p.m. on June 20th, Mr. Reed ran a report regarding Ms. Mortimer's absences that showed this. (Ex. 19, 6/20/2017 Attendance Report; Ex. 3, Reed Depo, pgs. 58 [at line 7] – 59 [ending line 13]). Wal-Mart, however, chose to move forward with Ms. Mortimer's termination.

**D.    The "honest belief" rule is not applicable to a claim for FMLA interference and is not dispositive of Ms. Mortimer's pretext arguments.**

Because the motives of Wal-Mart are not at issue in an FMLA interference claim, the "honest belief" rule is inapplicable. *Phipps, supra* at *13, citing *Tillman v. Ohio Bell Telephone Corp.*, 545 Fed. Appx. 340, 351 (6th Cir. 2013).

---

[12]    See *Green*, 2013 WL 3223629, *9.

As to the retaliation claim, the court in *Phipps* noted that the Sixth Circuit questioned the applicability of the honest belief rule to the "did not actually motivate" theory of pretext." *Id.* at *15, quoting *Amos*, 622 Fed. Appx. at 541, n.10. To show an honest belief, the employer must be able to establish its reasonable reliance on the particularized facts that were before it at the time the decision was made. *Mickey*, 516 F. 3d at 52. Given the contradictory and shifting evidence regarding (a) the reason for the denial of Ms. Mortimer's FMLA request, (b) the circumstances surrounding her protest of such denial, and (c) ***most importantly, who made the decision and how the decision was made to terminate Ms. Mortimer***, Wal-Mart cannot rely on the "honest belief" rule. *Id*. at 528 (rejecting defendant's claim of honest belief).

**WHEREFORE,** viewing all the evidence presented in a light that is most favorable to Plaintiff, Defendant Wal-Mart's motion for summary judgment should be denied.

Respectfully submitted,

   */s/ Kami D. Brauer*
KAMI D. BRAUER (#0071030)
The Law Firm of Kami D. Brauer, LLC
700 West St. Clair Avenue, Suite 316
Cleveland, Ohio 44113
(216) 236-8537 (Telephone)
(216) 621-7810 (Facsimile)
kamibrauer@kdbrauerlaw.com (Email)

*Counsel for Plaintiff*

## CERTIFICATION OF EXCHANGE WITH DEFENDANT'S COUNSEL

Plaintiff Susan L. Mortimer certifies that she has complied with this Court's Order dated April 18, 2018 (Doc. 12), requiring counsel for Plaintiff to confer with counsel for Wal-Mart prior to Defendant's filing of its summary judgment motion. By letter dated October 15, 2018, counsel for Wal-Mart requested judgment on all of Plaintiff's claims, and Ms. Mortimer responded by letter dated October 22, 2018, providing her factual and legal justifications for not dismissing her claims or granting judgment in favor of Wal-Mart.

_/s/ Kami D. Brauer_____
KAMI D. BRAUER (#0071030)

*Counsel for Plaintiff*

## <u>CERTIFICATION OF PAGE LIMITATION</u>

I hereby certify that: (1) this case has been assigned to the standard track pursuant to Local Rule 16.2 and the Court's 4/18/2018 Case Management Order; and (2) Plaintiff Mortimer's Opposition to Defendant's Motion for Summary Judgment complies with this Court's 12/7/2018 Order permitting Plaintiff 25 pages to respond to Defendant's summary judgment motion. Pursuant to Local Rule 7.1(f), Plaintiff certifies that, because her memoranda is over 15 pages in length, she has included a Table of Contents, Table of Authorities, Brief Statement of the Issues to be Decided, and Summary of the Arguments Presented.

_\_\_/s/ Kami D. Brauer_____
KAMI D. BRAUER (#0071030)

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I hereby certify that on 14th day of December 2018, a copy of the foregoing Plaintiff Mortimer's Opposition to Defendant's Motion for Summary Judgment was filed electronically. Notice of this filing will be sent to all parties by operation of the Court's electronic filing system, and the parties may access this filing through the Court's system.

Copies of those exhibits filed under seal have been served upon the following via email:

Donald C. Bulea, Esq.                     *Counsel for Defendant*
Giffen & Kaminski, LLC
1300 East Ninth Street, Suite 1600
Cleveland, Ohio 44114


                                          __/s/ Kami D. Brauer_____
                                          KAMI D. BRAUER (#0071030)

                                          *Counsel for Plaintiff*